2016 UT App 149

# THE UTAH COURT OF APPEALS

WEST VALLEY CITY,
Petitioner,
*v.*
JOHN COYLE AND WEST VALLEY CITY
CIVIL SERVICE COMMISSION,
Respondents.

Opinion
No. 20140457-CA
Filed July 14, 2016

Original Proceeding in this Court

Camille N. Johnson, Judith D. Wolferts, and Maralyn
M. English, Attorneys for Petitioner

Erik Strindberg, Attorney for Respondent John Coyle

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGE
KATE A. TOOMEY and JUSTICE JOHN A. PEARCE concurred.[1]

ORME, Judge:

¶1     Following an investigation into allegations of misconduct, Lieutenant John Coyle was disciplined by the West Valley City Police Department, being demoted two steps, from lieutenant to patrol officer. Coyle sought the West Valley City Civil Service Commission's review of the disciplinary decision. The Commission determined that the discipline was disproportionate

---

1. Justice John A. Pearce began his work on this case as a member of the Utah Court of Appeals. He became a member of the Utah Supreme Court thereafter and completed his work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(3).

to the violations in question and reinstated Coyle as a lieutenant. West Valley City now seeks our review of the Commission's decision. Because we conclude that the Commission did not abuse its discretion, we decline to disturb its decision.

BACKGROUND

¶2     Coyle began working as a patrol officer for West Valley City in 2000. He was promoted to lieutenant in 2008 and in 2010 began working with the Neighborhood Narcotics Unit (the NNU). Coyle received commendations and positive performance reviews for his work as the lieutenant in charge of the NNU. With the exception of a letter of reprimand for being at fault in a traffic accident, Coyle's service record with the City was free from disciplinary action until the demotion at issue in this case.

¶3     The NNU was disbanded following an officer-involved shooting in November 2012. One of the officers, Detective Cowley, was investigated by the City beginning in 2013. In the course of that investigation, Cowley accused essentially every member of the former NNU of "engaging in improper and/or illegal conduct." These accusations prompted investigation of six other NNU detectives, as well as a sergeant and Coyle.

¶4     In the course of its investigation, the City determined that members of the NNU had violated departmental policies in a variety of ways, and in August 2013, the Police Chief sent Coyle a Notice of Disciplinary Decision, demoting him to patrol officer. The Police Chief concluded that Coyle had violated departmental policy regarding "Property Handling" because "when seized vehicles were cleaned out prior to be[ing] auctioned[,] property was removed and thrown away and change was collected and used to purchase [soft] drinks. The collected money was not booked into evidence [or otherwise] documented." The Police Chief further found that Coyle had

violated departmental policies regarding "Conduct," "Supervisor Responsibility," and "Blue Team Software" because Coyle

> failed to provide proper supervision and accountability to detectives assigned to the NNU[,] and this resulted in detectives not properly investigating and documenting activities. Detectives did not properly handle evidence seized in the course of the investigations and account for money and contraband. This ultimately resulted in dismissal of criminal prosecutions and reflected unfavorably on the Department and the City. . . . [Coyle was] aware detectives were using GPS tracking devices in violation of Court rulings, State Law[,] and Department Policy. . . . [T]he use of force by NNU detectives on traffic stops [was] not properly investigated and documented as mandated by Department Policy.

The Notice summarized that "[b]y participating in the above conduct," Coyle had "displayed a casual disregard for [departmental] policy and the responsibilities of a supervisor which will not be tolerated."

¶5   Other members of the former NNU received varying forms of discipline. The sergeant, who had received prior discipline in the form of a forty-hour suspension, was given an eighty-hour suspension. Four detectives, all of whom had prior instances of discipline, received "letters of counsel." And one detective, who had previously received one letter of reprimand, was given a forty-hour suspension.

¶6   Of all the NNU officers found to have engaged in misconduct, Coyle received the most serious discipline by far, and he appealed the adverse decision to the Commission. On May 15, 2014, the Commission issued its decision. The Commission found that sufficient evidence existed to support

the Police Chief's determination that Coyle had violated the four policies mentioned above. But because the Commission also found that the violations did not warrant the discipline imposed, it ordered that Coyle be reinstated to his position as a lieutenant. The City now asks us "to reverse the Commission's Decision, and reinstate [the Police Chief]'s Disciplinary Decision."

ISSUES AND STANDARDS OF REVIEW

¶7    The City contends that the Commission abused its discretion and exceeded its authority in the following ways: first, by failing to make necessary findings of fact and failing to consider a number of accusations against Coyle in reaching its overall conclusions; second, by making certain erroneous evidentiary rulings; and third, by erroneously determining that Coyle's discipline was not warranted by his conduct.

¶8    In determining whether a municipal civil service "commission has abused its discretion or exceeded its authority," Utah Code Ann. § 10-3-1012.5 (LexisNexis 2015), we apply "varying standards of review depending on the error alleged," *Tolman v. Salt Lake County Attorney*, 818 P.2d 23, 27 (Utah Ct. App. 1991). We review issues involving the Commission's "factual findings using a clearly erroneous standard." *Id.* Decisions "traditionally left to the discretion" of the Commission will not be disturbed unless they are "'arbitrary, capricious, or unreasonable.'" *Id.* (quoting *Child v. Salt Lake City Civil Serv. Comm'n*, 575 P.2d 195, 197 (Utah 1978)). This includes issues touching on the Commission's application of law to the facts. *AE Clevite, Inc. v. Labor Comm'n*, 2000 UT App 35, ¶ 7, 996 P.2d 1072. And where the City claims that the Commission "has stepped out of the arena of [its] discretion and thereby crossed the law, we review using a correction of error standard, giving no deference" to any purely legal determination made by the Commission. *Tolman*, 818 P.2d at 27.

¶9 Furthermore, the City's arguments regarding the Commission's evidentiary rulings touch on hearsay evidence and the application of the "residuum rule." *See Prosper, Inc. v. Department of Workforce Servs.*, 2007 UT App 281, ¶ 10, 168 P.3d 344 (explaining that hearsay evidence is admissible in administrative hearings but that "[u]nder the residuum rule, findings of fact . . . must be supported by a residuum of legal evidence competent in a court of law") (alteration and omission in original) (citation and internal quotation marks omitted). "The determination of whether evidence constitutes hearsay is a question of law that we review for correctness." *Id.* ¶ 8. We also review the Commission's application of the residuum rule for correctness. *See Industrial Power Contractors v. Industrial Comm'n of Utah*, 832 P.2d 477, 479 (Utah Ct. App. 1992) ("Whether the factual findings were based on a residuum of competent evidence is a question of law which we review for correctness.").

ANALYSIS

I. The Commission Made Legally Sufficient Findings of Fact and Adequately Considered All Accusations Against Coyle.

¶10 The City complains that "the Commission failed to make findings of fact on WVCPD Policy 300.5 (Supervisor Responsibility), did not include in its 'Conclusions and Order' that Coyle violated WVCPD 340.3.5(ab) (Performance)," and "failed to address [the Police Chief's] finding that Coyle [refused] to take personal responsibility as a supervisor." These complaints are unavailing, as the Commission did make findings of fact regarding Supervisor Responsibility and considered all of the violations alleged by the Police Chief in reaching its decision.

¶11 It is well settled that in a disciplinary review "the Commission is under an obligation to address each of the grounds for termination stated by the department head." *Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 14, 116 P.3d 973.

Failure to consider relevant conduct of the disciplined employee may result in reversal of the Commission's order. *See id.* ¶ 15.

¶12   The Police Chief indicated that he disciplined Coyle in part because Coyle "failed to provide proper supervision and accountability." In its order, the Commission found that "sufficient evidence exist[ed] to support the allegation that Lt. Coyle violated the West Valley Police Department Policy . . . 300.5 Supervisor Responsibility." Furthermore, the Commission specifically found that "Coyle failed to supervise the NNU personnel under his supervision." Perhaps most telling, the Commission also referenced Coyle's own admission that during his time as the lieutenant in charge of the NNU, there were violations of departmental policy regarding supervisor responsibility. Given the uncontested nature of this particular charge, the Commission's explicit finding that sufficient evidence supported the allegation, and its incorporation of these facts into its analysis, the City's contention that the Commission "failed to address Policy 300.5 except to reference it" is simply incorrect.

¶13   As to the City's suggestion that the Commission erred by not mentioning either Policy 340.3.5(ab) or the performance violation in its Conclusion and Order, we agree with Coyle that "[t]his argument puts form over function." It is true that the Commission's order contains a section entitled "Conclusion and Order," and in this section there is no reference to either "Policy 340.3.5(ab)" or "Performance." But this section is simply meant to offer a summary of the Commission's findings and the result of the proceedings; it is not intended to represent the entirety of the Commission's order.[2] We therefore look to the order as a

---

2. This court regularly includes in its decisions a conclusion section that offers a brief summary of the outcome on appeal. But like the conclusion section at the end of this opinion, this section rarely, if ever, captures the entirety of our analysis or

(continued…)

whole to determine whether the Commission met the requirements of *Harmon* by addressing this particular policy violation. *See id.* ¶ 14.

¶14   As with its findings regarding Supervisor Responsibility, the Commission explicitly indicated that "sufficient evidence exist[ed] to support the allegation that Lt. Coyle had violated the West Valley Police Department Policy . . . 340.3.5(ab)." In that section of its order, the Commission refers to the policy as "Conduct," but we have no trouble understanding that this is the same policy on which the Police Chief based his decision, particularly because in its order, the Commission devotes nearly an entire page to its finding that "Coyle failed to comply with WVCPD Policy 340.3.5 (ab) Performance."

¶15   Finally, the City asserts that "the Commission failed to address [the Police Chief's] finding that Coyle failed to take personal responsibility as a supervisor." We understand this contention to refer to the Police Chief's statement, in Coyle's notice of disciplinary action, that he was "dismayed at [Coyle's] egregious failure to accept personal responsibility for the breakdown of allegiance, compliance and respect for the law and Department Policy within the [NNU] under [Coyle's] command." Notably, this was not included as "information [the Police Chief] consider[ed] relevant in making [his] decision." It was not cited as constituting a policy violation. Indeed, it was not referred to as a "finding" in any way. In short, it was not a "ground[] for termination stated by the department head." *See id. See also Salt Lake City Corp. v. Salt Lake City Civil Serv. Comm'n*, 2006 UT App 47U, para. 11 (disagreeing with a city's contention that a commission failed to consider certain conduct of the

---

(…continued)
covers all points decided. Indeed, such an all-inclusive conclusion would be quite redundant.

disciplined police officer because in the officer's "letter of termination, the Chief did not charge" the officer with that conduct).

¶16   The Commission therefore fulfilled its "obligation to address" Coyle's violations of the department's Supervisor Responsibility and Performance policies. *See Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 14, 116 P.3d 973.

## II. The City Has Not Demonstrated Prejudice Stemming from Any of the Commission's Evidentiary Rulings.

¶17   The City argues that the "Commission erred in evidentiary rulings and by prohibiting [the Police Chief] from testifying about matters he relied on in making his Disciplinary Decision." But we will not disturb a ruling alleged to be erroneous "[u]nless [the petitioner] demonstrates [the] error is prejudicial." *Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242. And where the alleged error "is about the exclusion of evidence, it is essentially impossible to demonstrate prejudice" without "a proffer of what the excluded evidence would show." *Id.* The City failed to proffer, on the record, what the excluded evidence would establish, and thus it cannot demonstrate that it was prejudiced by the exclusion of the evidence.

¶18   In the course of the proceedings before the Commission, Coyle moved to strike several predisciplinary hearing transcripts. Rather than granting the motion to strike, the Commission made the transcripts subject to a protective order, ruling that no direct reference to the transcripts could be made during the open hearing. The City agreed to the protective order.

¶19   During the hearing, the Police Chief attempted to reference the contents of the protected transcripts but was prohibited from doing so. The Commission also excluded some of the City's evidence on hearsay grounds. The City argues that the Commission's decisions should be reversed because these

evidentiary rulings "undermined the hearing by miring [the City's] witnesses in quicksand, which impacted the Decision."

¶20    The City is absolutely correct in its assertion that "hearsay may be considered in administrative hearings." *See Prosper, Inc. v. Department of Workforce Servs.*, 2007 UT App 281, ¶ 10, 168 P.3d 344. But the allowance of hearsay evidence is tempered by the residuum rule, which requires that findings of fact not be based exclusively on hearsay evidence that would be inadmissible in court if duly objected to. *See id.* ¶ 11. We further acknowledge that the residuum rule is conceptually perplexing and often misapplied by administrative bodies.[3] *See id.* However, we need not spend time in this opinion revisiting the workings of the rule or evaluating the Commission's use of it because the City has failed to demonstrate that it was prejudiced by any exclusion of evidence.

¶21    The City declares that it "is incomprehensible that a police chief making a disciplinary decision cannot discuss his reasons for that decision." And on its face, this seems to be a logical assertion. But our hands are tied in evaluating whether the Commission might have decided differently if it had heard the excluded evidence because the City made no proffer as to what the excluded evidence would establish. "Where the complaint on appeal is about the exclusion of evidence, it is essentially impossible to demonstrate prejudice in the absence of a proffer of what the excluded evidence would show." *Huish*, 2008 UT App 283, ¶ 8. Because the City cannot demonstrate prejudice, it ultimately is of no consequence whether the Commission erred

---

3. Indeed, our opinion in *Prosper* devoted several paragraphs to unraveling the confusion in this area that had been inadvertently abetted by several judicial opinions. *See Prosper, Inc. v. Department of Workforce Servs.*, 2007 UT App 281, ¶¶ 10–11, 168 P.3d 344.

in excluding the evidence that the City believes was important. *See id.*

### III. The Commission Did Not Abuse Its Discretion by Deciding That Coyle's Conduct Did Not Warrant Demotion.

¶22    The City argues that the Commission abused its discretion when it overturned the Police Chief's disciplinary decision. More particularly, the City asserts that the Commission erred in a number of its findings and conclusions that contributed to its decision that Coyle's conduct did not warrant the sanction imposed.

¶23    First, the City takes issue with the Commission's conclusion that "the City did not provide the Commission credible evidence . . . that the reason for the District Attorney's dismissal of any of the cases brought by WVCPD was due to Lt. Coyle or the NNU's failure to properly handle evidence." In other words, although the Commission sustained the Police Chief's finding that Coyle had violated the Department's policy regarding property handling, the Commission was not convinced that the mishandling of evidence directly led to the dismissal of any criminal cases.

¶24    "We do not review the Commission's findings de novo or reweigh the evidence. Instead, we defer to the Commission's findings on issues of credibility." *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997) (internal citation omitted). The Commission acknowledged that the City relied on "news articles and public statements by the District Attorney as evidence" but determined that, because the City failed to present such evidence "through testimony or official records from the District Attorney," the City had failed to present credible evidence on this point. Before this court, the City fails to

demonstrate that that finding should be disturbed, so we decline to do so.[4]

¶25 Second, the City claims that "the Commission erred in stating it would not consider the change issue even though the Findings of Fact substantiated that charge." The City's use of the phrase "the change issue" refers to the NNU's practice of "cleaning out seized vehicles and keeping tools and loose change for NNU." A more accurate explanation of the Commission's treatment of "the change issue" is that it considered the issue and found that Coyle had engaged in the complained-of conduct, but determined that the conduct did not constitute a clear violation of departmental policy. We cannot say that this determination was in error.

¶26 Coyle presented evidence to the Commission that, as it relates to the change issue, Policy 804.3 Property Handling was unclear and the practice in place before he was assigned to the NNU was consistent with the practice while he oversaw the NNU. There was no dispute that the Department had not instituted an override of that practice. Because the NNU's treatment of the change issue "was transparent and known by at least one of Lt. Coyle's supervisors," and because "the policy is not specific and the practice was established at the time Lt. Coyle was assigned to the NNU," the Commission concluded that "Coyle did not violate WVCPD Policy 804.3 Property Handling as it relates to the cleaning out of seized vehicles."

---

4. Insofar as the City's argument relates to evidence that the Commission refused to receive, we have already determined that there was no on-the-record proffer of the excluded evidence that would allow us to evaluate what prejudice, if any, resulted from the exclusion of that evidence. *See supra* ¶¶ 17–21.

¶27 In alleging error in this conclusion, the City simply provides us with an alternate view of the change issue and how it might be considered a violation of the property handling policy, but it does not explain how the Commission's failure to adopt that view was erroneous. "Pinpointing where and how the [Commission] allegedly erred is the [petitioner's] burden." *See GDE Constr., Inc. v. Leavitt*, 2012 UT App 298, ¶ 24, 294 P.3d 567. "An appellate court that assumes that burden on behalf of an appellant distorts the fundamental allocation of benefits and burdens." *Id.* (brackets, citation, and internal quotation marks omitted). We therefore decline to disturb the Commission's decision in this regard. *See Perez v. South Jordan City*, 2014 UT App 31, ¶ 18, 320 P.3d 42 (declining to disturb a commission's determination that the conduct at issue violated a department's written policy).

¶28 The City next argues that "the Commission erred by deeming policy violations 'technical' when determining discipline." The "technical" designation comes from the Commission's order, where it indicated, "When considering Lt. Coyle's violations, it is clear that they relate to his official duties[;] however[,] due to the lack of clear policy direction, evidence of harm done to WVCPD in terms of public confidence and employee morale by Lt. Coyle in violating policy[,] the Commission finds that the substantiated violations are technical." The Commission does not define what it means by "technical," but the context suggests that while Coyle's conduct violated departmental policies, the violations were not deemed especially serious by the Commission. Because it touches on the Commission's findings as to seriousness, and therefore the proportionality of the misconduct found by the Commission to the discipline imposed, this argument necessarily ties into the final issue raised by the City—that "the Commission erred in determining the charges did not warrant demotion to patrol officer." We therefore consider these issues together.

¶29    "In determining whether the sanction of [demotion] is warranted in this case, the Commission must affirm the sanction if it is (1) appropriate to the offense and (2) consistent with previous sanctions imposed by the department." *Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 16, 116 P.3d 973. This means that if the discipline is either not proportional to the offense or is not consistent with previous sanctions, a sanction may be reversed by a civil service commission or overridden by this court. In a judicial review proceeding like this one, we do not directly review the Police Chief's decision for proportionality and consistency; instead, we review the Commission's determination and do so only to remedy any abuse of discretion on its part. *See Nelson v. Orem City*, 2012 UT App 147, ¶ 16 & n.5, 278 P.3d 1089, *aff'd*, 2013 UT 53, 309 P.3d 237.

A.    The Commission Did Not Abuse Its Discretion in Concluding That Coyle's Conduct Did Not Warrant the Sanction Imposed.

¶30    There is no single set of factors that must be considered when conducting a proportionality review. However, prior cases have indicated that appropriate factors might include whether the employee has an exemplary service record; whether the evidence of misconduct is tenuous; whether the employee has been dishonest; whether there are numerous violations; whether there has been ineffective progressive discipline; whether the violations relate directly "to the employee's official duties"; whether the violations "significantly impede" an employee's ability to carry out official duties; whether the offense adversely affects public confidence; whether the offense undermines morale and effectiveness; and whether the violation was willful or knowing, as opposed to negligent or inadvertent. *Harmon*, 2005 UT App 274, ¶ 18. *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 25, 8 P.3d 1048; *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 762 (Utah Ct. App. 1997).

¶31   In considering this first inquiry—whether demotion by two steps was proportional to Coyle's conduct—the Commission looked primarily at the severity of the policy violations and Coyle's employment history with the Department. Both factors, in the Commission's judgment, weighed in favor of finding that Coyle's demotion was disproportionate to his conduct.

¶32   We begin by considering the Commission's classification of certain violations as "technical" and therefore not serious enough to warrant demotion. Dubbing the violations "technical" was a way for the Commission to take into account factors that mitigated Coyle's behavior. For instance, when NNU detectives transported evidence for other detectives who first came into possession of the evidence, they violated the department's policy on property handling. And Coyle admitted that the NNU did not follow this policy. But because there was no evidence that this failure undermined morale, negatively impacted the effectiveness of the department, or damaged public confidence, there was essentially no harm, in the Commission's view, that resulted from the violation, making the violation not as severe as it might otherwise have been.

¶33   Next, "Coyle admitted that he failed to ensure that members of the NNU were properly documenting use of force pursuant to the new Blue Team policy." This policy was first implemented in 2011 but was not fully implemented until 2012. Prior to the new policy, NNU members were not required to document each time they drew their weapon during a traffic stop as a use of force. The Commission found that while the policy was being implemented, Coyle and his supervisors failed to recognize "the effect of the change in policy on the NNU's practice and operating procedures." The Commission further found that "Coyle's negligence was mitigated by the fact that any violation was in the first few months of the actual implementation of the policy" and that violation of the policy was therefore "technical in nature."

¶34   The City contends that the Commission's decision to "downgrade violations by deeming them 'technical' is improper" and "proves [the Commission] substituted its opinion for [the Police Chief's]." We disagree. The Commission was tasked with evaluating the proportionality of Coyle's discipline to his conduct. Part of that review necessarily required the Commission to determine how serious Coyle's violations of departmental policies were. The Commission determined that, on the whole, the violations were not very serious. It then considered the seriousness of the violations in light of Coyle's lack of prior discipline. *Cf. Hollenbach v. Salt Lake City Civil Serv. Comm'n*, 2015 UT App 116, ¶ 23, 349 P.3d 791 (indicating that where an officer had been disciplined on several prior occasions, "[c]onsidering all the circumstances of this case necessarily includes consideration of [the officer's] prior discipline").

¶35   Coyle's only discipline leading up to the investigation at issue in this case was one letter of reprimand after he was at fault in a traffic accident. Additionally, Coyle's employment record was replete with regular promotions, increases in the amount of responsibility given to him, and favorable performance reviews. The Commission determined that this "indicates that he was a valued and contributing employee" and concluded that "despite giving deference to [the Police Chief], given Lt. Coyle's otherwise positive record, the evidence presented to the Commission at the hearing of the technical policy violations does not justify a demotion." This determination is logical, supported by the record, and cannot be said to be an abuse of the Commission's discretion.

B.   The Commission Did Not Abuse Its Discretion in Concluding That Coyle's Discipline Was Not Consistent with Previous Discipline.

¶36   Finally, the Commission properly exercised its discretion when it concluded that "Coyle's discipline—demotion—is not

consistent with the treatment of other officers for similar conduct."[5] As part of this conclusion, the Commission readily "agree[d] that supervisors are held to higher standards." We, too, recognize that a police chief may—and perhaps should— discipline a lieutenant more severely than the officers the lieutenant supervises, as more is expected of employees in leadership positions. *See Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 5, 116 P.3d 973 (condemning a fire captain for furthering inappropriate behavior "[w]hen, as a captain, [he] should have corrected the employee and warned her about making improper comments"). But the Commission concluded that even taking into account Coyle's position as a lieutenant, his discipline was inconsistent with the discipline imposed on other officers for the same or similar conduct.

¶37    We agree with the City that the burden of establishing inconsistent discipline rested with Coyle at the Commission level. *See Huemiller v. Ogden Civil Serv. Comm'n*, 2004 UT App 375, ¶ 6, 101 P.3d 394. But we disagree with the City that "it was error to compare NNU detectives because they are not similarly situated" or "to compare [the sergeant] because he was not similarly situated." Specifically, Coyle used the discipline of

---

5. It is enough that Coyle demonstrated that his conduct did not warrant demotion, and we could choose to uphold the Commission's order on that basis alone, even if Coyle could not demonstrate inconsistency between his discipline and previous discipline in the department. *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 33 n.10, 8 P.3d 1048 ("It should not be feared that a party who is severely punished, but has no history of inconsistency to turn to, is without recourse. While the party may have no basis to claim disparity, the party still retains the protection of proportionality review."). We also consider the consistency element for the guidance it might offer to police chiefs and civil service commissions in future cases.

other NNU members involved in the same or similar activities to demonstrate that he was punished significantly more severely than others. Of course neither the other NNU detectives nor the sergeant were in the exact same situation as Coyle, who was a lieutenant. And there was no other NNU lieutenant who was disciplined for similar misconduct to whom Coyle could be compared. But our case law does not require comparison to identically situated employees but instead only to "similarly situated employees." *See Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 30, 8 P.3d 1048. Under the circumstances, with other members of the NNU being accused of the same conduct as Coyle, they were similar enough to warrant comparison, albeit with some factoring in of the differences in rank and disciplinary history.

¶38    All of the other NNU members who were disciplined for the conduct related to this case had been previously disciplined more severely than Coyle had been, Coyle having received just one letter of reprimand. Yet as a result of the investigation in this case, those same NNU members received less severe discipline than Coyle. While lieutenant-to-sergeant or lieutenant-to-detective are not perfect comparisons, they are similar enough, in the absence of a more comparable officer, to support the Commission's finding that the Police Chief's "decision to demote Lt. Coyle is not consistent."[6]

---

6. Furthermore, although the burden of demonstrating inconsistency rests on the employee, the City cannot sit on its hands when in front of the Commission, choose not to rebut the evidence presented, and then on judicial review claim that the discipline used as a comparison does not meet the requirement that employees be similarly situated. We assume that if the City had evidence of more exact comparisons—i.e., lieutenants being disciplined for the same or similar conduct—it would have presented such evidence to the Commission, but it did not.

(continued…)

CONCLUSION[7]

¶39 The City's contentions that the Commission abused its discretion are without merit. The Commission made sufficient findings of fact and relied on all of the grounds for termination cited by the Police Chief. Any errors it might have made in the exclusion of evidence are deemed harmless because the City has failed to demonstrate prejudice. The Commission acted within its discretion in determining that the severity of Coyle's violations did not warrant demotion and that demotion was inconsistent with the discipline imposed on similarly situated employees. For these reasons—and the ancillary ones explained in this opinion—we decline to disturb the Commission's decision. We uphold the Commission's order that Coyle be reinstated as a lieutenant and that he receive back pay for the time he was demoted.

———————————

(…continued)
We are then left only with the comparisons presented by Coyle, which seem to us sufficient under the circumstances here, where all the members of an entire unit of the police department were investigated at the same time, culminating in the unit being disbanded.

7. *See supra* note 2.